UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| JOSEPH GUTIERREZ, KYLE LYNN, and RYAN STEPHENS, each individually and on behalf of all others similarly situated, <br><br> v. <br><br> DRILL CUTTINGS DISPOSAL COMPANY, L.L.C.; THE REDDOCH DEVELOPMENT COMPANY, L.L.C.; JEFFREY REDDOCH, Sr.; JEFFREY REDDOCH, Jr.; CHIQUITA REDDOCH; ALLISON REDDOCH REAUX; LEAH M. REDDOCH O'MEARA; JEREMIAH M. REDDOCH; and SEAN M. REDDOCH. | **Case No.: 5:18-cv-00257** <br> FLSA Collective Action <br> Fed. R. Civ. P. 23 Class Action |

### ORIGINAL CLASS AND COLLECTIVE ACTION COMPLAINT

#### SUMMARY

1.      Drill Cuttings Disposal Company, L.L.C. ("DCDC") provides drill cuttings disposal services to the oil and gas industry.

2.      DCDC pays some of its employees a flat amount for each day worked.

3.      Although these workers regularly work more than 40 hours a week, DCDC does not pay them overtime.

4.      DCDC's policy of paying these employees a day rate, with no overtime pay, violates the Fair Labor Standards Act ("FLSA").

5.      DCDC's policy of paying these employees a day rate, with no overtime pay, also violates state laws of the states in which the employees worked.

6.      This collective and class action seeks to recover the unpaid wages and other damages owed to these workers.

7.     This isn't the first time Plaintiffs have had to bring suit to recover their unpaid wages and other damages from Defendants. *See Lynn v. Drill Cuttings Disposal Company* ("*DCDC 1*"), No. 5:14-cv-00017-DAE (W.D. Tex.) (Ezra, J.).

8.     However, DCDC moved to compel arbitration based on an arbitration "agreement" that it required all its workers to sign as a condition of employment.

9.     After compelling arbitration in this Court, Lynn and Gutierrez instituted an arbitration before the American Arbitration Association ("AAA"). *Gutierrez v. Drill Cuttings Disposal Co. LLC* ("*DCDC 2*"), No. 01-15-0002-6872 (AAA).

10.     Under the terms of the arbitration agreement DCDC imposed on its workers, DCDC was responsible for paying certain costs of the arbitration (including the arbitrator's compensation).

11.     But then DCDC didn't like the arbitrator's rulings, so it simply stopped paying its bills.

12.     For example, the arbitrator determined that DCDC's arbitration agreement arose from an employer-promulgated plan that allowed for collective arbitration.

13.     DCDC appealed the arbitrator's clause construction award, but this Court confirmed the arbitrator's award. *Drill Cuttings Disposal Co. LLC v. Gutierrez* ("*DCDC 5*"), No. 5:16-cv-00860-DAE (W.D. Tex.) (Ezra, J.).

14.     In the meantime, DCDC stopped paying the AAA's fees (despite its contractual obligation to do so). So the AAA terminated the arbitration.

15.     DCDC refused to participate or foot the bill for the arbitration that it demanded this Court compel.

16.     Plaintiffs are therefore returning to this Court to litigate their claims.

17.     Plaintiffs bring this collective and class action to recover the unpaid overtime and related damages owed to Defendants' workers under the FLSA and the state laws of New Mexico, North Dakota, Pennsylvania, and Ohio.

## JURISDICTION AND VENUE

18.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA, 29 U.S.C. § 216(b).

19.    The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the federal question claims that they form a part of the same case or controversy.

20.    Plaintiffs' state law claims are not novel or complex. 28 U.S.C. § 1367(c)(1).

21.    Plaintiffs' state law claims do not predominate over their federal question claims. 28 U.S.C. § 1367(c)(2).

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## APPLICABLE STATE LAW

23.    The "New Mexico Wage Laws" refers to the New Mexico Minimum Wage Act ("NMMWA"), NMSA § 50-4-19, *et seq.*

24.    The "North Dakota Wage Laws" refers to North Dakota Century Code 34 and the North Dakota Minimum Wage and Work Conditions Order (N.D. Admin Code § 46-02-07-01, *et seq.*).

25.    The "Ohio Wage Laws" refers to the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111, *et seq.*, ("the Ohio Wage Act"), and the Ohio Prompt Pay Act ("OPPA"), Ohio Rev. Code § 4113.15.

26.    The "Pennsylvania Wage Laws" refers to the Pennsylvania Minimum Wage Act ("PMWA"), 43 PA. STAT. ANN. § 333.104.

## THE PARTIES

27.    Gutierrez was employed by DCDC as a solids control technician.

28.    Gutierrez was paid according to DCDC's day rate policy.

29.     Gutierrez worked for DCDC in this District and Division.

30.     Gutierrez performed work for DCDC in North Dakota.

31.     Gutierrez initially filed suit against DCDC on January 7, 2014. *DCDC 1*, ECF No. 1.

32.     Gutierrez's written consent is attached as Exhibit A.

33.     Lynn was employed by DCDC as a solids control technician.

34.     Lynn was paid according to DCDC's day rate policy.

35.     Lynn performed work for DCDC in this District and Division.

36.     Lynn filed his initial written consent on January 29, 2014. *DCDC 1*, ECF No. 6.

37.     Lynn's written consent is attached as Exhibit B.

38.     Stephens was employed by DCDC as a solids control technician.

39.     Stephens was paid according to DCDC's day rate policy.

40.     Stephens performed work for DCDC in New Mexico.

41.     Stephens performed work for DCDC in North Dakota.

42.     Stephens performed work for DCDC in Ohio.

43.     Stephens performed work for DCDC in Pennsylvania.

44.     Stephens performed work for DCDC in several other states, including Texas, Louisiana, and West Virginia.

45.     Stephens filed his initial written consent on April 21, 2015.

46.     Stephens' written consent is attached as Exhibit C.

47.     DCDC paid Gutierrez, Lynn, Stephens, and all of its day rate workers a flat amount for each day worked with no overtime premium for hours worked in excess of 40 in a workweek.

48.     Plaintiffs represent at least four classes of similarly situated co-workers.

49.     First, Gutierrez, Lynn, and Stephens represent a class of similarly situated day rate workers under the FLSA pursuant to 29 U.S.C. § 216(b). The FLSA Class is defined as:

**All day rate workers employed by Drill Cuttings Disposal Company LLC in the United States since January 7, 2011.**

50.    Second, Stephens represents a class of similarly situated day rate workers under the New Mexico Wage Laws pursuant to Federal Rule of Civil Procedure 23. The New Mexico Class is defined as:

**All day rate workers employed by Drill Cuttings Disposal Company LLC in New Mexico since January 7, 2011.**

51.    Third, Gutierrez and Stephens represent a class of similarly situated day rate workers under the North Dakota Wage Laws pursuant to Federal Rule of Civil Procedure 23. The North Dakota Class is defined as:

**All day rate workers employed by Drill Cuttings Disposal Company LLC in North Dakota since January 7, 2011.**

52.    Fourth, Stephens represents a class of similarly situated day rate workers under the Ohio Wage Laws pursuant to Federal Rule of Civil Procedure 23. The Ohio Class is defined as:

**All day rate workers employed by Drill Cuttings Disposal Company LLC in Ohio since January 7, 2011.**

53.    Fifth, Stephens represents a class of similarly situated day rate workers under the Pennsylvania Wage Laws pursuant to Federal Rule of Civil Procedure 23. The Pennsylvania Class is defined as:

**All day rate workers employed by Drill Cuttings Disposal Company LLC in Pennsylvania since January 7, 2011.**

54.    Collectively, the FLSA, New Mexico, North Dakota, Ohio, and Pennsylvania Class Members are referred to as "Putative Class Members" or the "Day Rate Workers."

55.    The Putative Class Members are easily ascertainable from DCDC's business records, particularly its personnel records.

56.    DCDC does business throughout Texas.

57.    DCDC does business throughout New Mexico.

58.     DCDC does business throughout North Dakota.

59.     DCDC does business throughout Ohio.

60.     DCDC does business throughout Pennsylvania.

61.     **DCDC** can be served through its registered agent for service of process, **Steven C. Lanza, 1200 Camellia Blvd., Ste. 300, Lafayette, LA 70508**, or by any other method permitted by law.

62.     **The Reddoch Development Company, L.L.C.** ("RDC") can be served through its registered agent for service of process, **Steven C. Lanza, 102 Versailles, Ste. 600, Lafayette, LA 70501**, or by any other method permitted by law.

63.     At all relevant times, Jeffrey Reddoch, Sr., was the Chief Executive Officer of DCDC.

64.     At all relevant times, Jeffrey Reddoch, Sr., was a manager of DCDC.

65.     At all relevant times, Jeffrey Reddoch, Sr., was a member of DCDC.

66.     At all relevant times, Jeffrey Reddoch, Sr., was an owner of DCDC.

67.     At all relevant times, Jeffrey Reddoch, Sr., was the Chief Executive Officer of RDC.

68.     At all relevant times, Jeffrey Reddoch, Sr., was a manager of RDC.

69.     At all relevant times, Jeffrey Reddoch, Sr., was a member of RDC.

70.     At all relevant times, Jeffrey Reddoch, Sr., was an owner of RDC.

71.     **Jeffrey Reddoch, Sr.** may be served with process at **104 Ramblewood Dr., Lafayette, LA 70508**, or by any other method permitted by law.

72.     At all relevant times, Jeffrey Reddoch, Jr., was the President of DCDC.

73.     At all relevant times, Jeffrey Reddoch, Jr., was a manager of DCDC.

74.     At all relevant times, Jeffrey Reddoch, Jr., was a member of DCDC.

75.     At all relevant times, Jeffrey Reddoch, Jr., was an owner of DCDC.

76.     At all relevant times, Jeffrey Reddoch, Jr., was the President of RDC.

77.    At all relevant times, Jeffrey Reddoch, Jr., was a manager of RDC.

78.    At all relevant times, Jeffrey Reddoch, Jr., was a member of RDC.

79.    At all relevant times, Jeffrey Reddoch, Jr., was an owner of RDC.

80.    **Jeffrey Reddoch, Jr.** may be served with process at **104 Ramblewood Dr., Lafayette, LA 70508**, or by any other method permitted by law.

81.    At all relevant times, Chiquita Reddoch, was a manager of DCDC.

82.    At all relevant times, Chiquita Reddoch, was a member of DCDC.

83.    At all relevant times, Chiquita Reddoch, was an owner of DCDC.

84.    At all relevant times, Chiquita Reddoch, was a manager of RDC.

85.    At all relevant times, Chiquita Reddoch, was a member of RDC.

86.    At all relevant times, Chiquita Reddoch, was an owner of RDC.

87.    **Chiquita Reddoch** may be served with process at **104 Ramblewood Dr., Lafayette, LA 70508**, or by any other method permitted by law.

88.    At all relevant times, Allison Reddoch Reaux, was a manager of DCDC.

89.    At all relevant times, Allison Reddoch Reaux, was a member of DCDC.

90.    At all relevant times, Allison Reddoch Reaux, was an owner of DCDC.

91.    At all relevant times, Allison Reddoch Reaux, was a manager of RDC.

92.    At all relevant times, Allison Reddoch Reaux, was a member of RDC.

93.    At all relevant times, Allison Reddoch Reaux, was an owner of RDC.

94.    **Allision Reddoch Reaux** may be served with process at **105 Balmoral Ct., Lafayette, LA 70503-6067**, or by any other method permitted by law.

95.    At all relevant times, Leah M. Reddoch O'Meara, was a manager of DCDC.

96.    At all relevant times, Leah M. Reddoch O'Meara, was a member of DCDC.

97.    At all relevant times, Leah M. Reddoch O'Meara, was an owner of DCDC.

98.    At all relevant times, Leah M. Reddoch O'Meara, was a manager of RDC.

99.    At all relevant times, Leah M. Reddoch O'Meara, was a member of RDC.

100.   At all relevant times, Leah M. Reddoch O'Meara, was an owner of RDC.

101.   **Leah M. Reddoch O'Meara** may be served with process at **1372 Old Frankfort Pl., Versailles, KY 40383-6900**, or by any other method permitted by law.

102.   At all relevant times, Jeremiah M. Reddoch, was a manager of DCDC.

103.   At all relevant times, Jeremiah M. Reddoch, was a member of DCDC.

104.   At all relevant times, Jeremiah M. Reddoch, was an owner of DCDC.

105.   At all relevant times, Jeremiah M. Reddoch, was a manager of RDC.

106.   At all relevant times, Jeremiah M. Reddoch, was a member of RDC.

107.   At all relevant times, Jeremiah M. Reddoch, was an owner of RDC.

108.   **Jeremiah M. Reddoch** may be served with process at **429 E. Broussard Rd., Lafayette, LA 70503-6152**, or by any other method permitted by law.

109.   At all relevant times, Sean M. Reddoch, was a manager of DCDC.

110.   At all relevant times, Sean M. Reddoch, was a member of DCDC.

111.   At all relevant times, Sean M. Reddoch, was an owner of DCDC.

112.   At all relevant times, Sean M. Reddoch, was a manager of RDC.

113.   At all relevant times, Sean M. Reddoch, was a member of RDC.

114.   At all relevant times, Sean M. Reddoch, was an owner of RDC.

115.   **Sean M. Reddoch** may be served with process at **103 Dunvegan Ct., Lafayette, LA 70503-6071**, or by any other method permitted by law.

116.   Jeffrey Reddoch, Sr., Jeffrey Reddoch, Jr., Chiquita Reddoch, Allison Reddoch Reaux, Leah M. Reddoch O'Meara, Jeremiah M. Reddoch, and Sean M. Reddoch are referred to collectively as the "Reddochs."

117.    DCDC, RDC, and the Reddochs employed and/or jointly employed Plaintiffs and the Putative Class Members.

118.    DCDC, RDC, and the Reddochs are joint employers for purposes of the FLSA. *See* 29 C.F.R. § 791.2.

### FACTS

119.    DCDC is a drill cuttings disposal company supplies products and services to the oil and gas industry. DCDC, Our Mission, http://www.drillcuttingsdisposalcompany.com/about.html (last visited Mar. 19, 2018).

120.    RDC and the Reddochs are the owners of DCDC.

121.    RDC and the Reddochs are the executives of DCDC.

122.    Defendants' Day Rate workers handle and/or work on goods or materials that moved in, or were produced for, interstate commerce.

123.    Each year since 2008, DCDC's gross revenues exceeded $500,000.

124.    Each year since 2008, RDC's gross revenues exceeded $500,000.

125.    Each year since 2008, Defendants' gross revenues exceeded $500,000.

126.    DCDC is an enterprise engaged in interstate commerce, is covered by the FLSA, and is subject to the FLSA's recordkeeping requirements and overtime wage requirements.

127.    Defendants are an enterprise engaged in interstate commerce, covered by the FLSA, and subject to the FLSA's recordkeeping requirements and overtime wage requirements.

128.    Over the past three years, DCDC employed dozens of individuals—including Plaintiffs—as day rate workers across Texas, Louisiana, New Mexico, North Dakota, Ohio, Pennsylvania, and West Virginia.

129.    Over the past three years, Defendants employed dozens of individuals—including Plaintiffs—as day rate workers across Texas, Louisiana, New Mexico, North Dakota, Ohio, Pennsylvania, and West Virginia.

130.    While the Putative Class Members' job duties may vary somewhat, these differences are not relevant for determining their rights to overtime pay.

131.    Defendants pay their Day Rate Workers a day rate for the work they perform.

132.    Plaintiffs' and the Day Rate Workers' day rates are readily found in Defendants' payroll records.

133.    The Day Rate Workers were paid a day-rate.

134.    The Day Rate Workers were not paid a salary.

135.    The Day Rate Workers were paid based on the number of days they worked.

136.    If a Day Rate Worker did not work on a certain day, then they were not paid for that day.

137.    A salary is not the same as a day rate.

138.    In fact, Defendants likely pay certain employees—such as office workers—a salary.

139.    Defendants nonetheless paid a day-rate without any overtime to certain employees, including Plaintiffs.

140.    It is well-known day-rate employees are not exempt from the overtime provisions of the FLSA and state wage laws, no matter what their job duties are.

141.    Defendants recorded the hours worked by their non-exempt employees, including Plaintiffs.

142.    Defendants' Day Rate Workers are non-exempt employees.

143.    DCDC, RDC, and the Reddochs had the power to hire and fire DCDC's employees, including Plaintiffs, and they regularly exercised this authority.

144.    DCDC, RDC, and the Reddochs set the amount of Plaintiffs' pay.

145.    DCDC, RDC, and the Reddochs set up DCDC's day rate pay plan.

146.    DCDC, RDC, and the Reddochs set Plaintiffs' work schedule.

147.    DCDC, RDC, and the Reddochs controlled Plaintiffs' job locations.

148.    DCDC, RDC, and the Reddochs set the employment policies and rules applicable to Plaintiffs.

149.    While the precise job duties of the Day Rate Workers may vary somewhat, any variations do not impact their entitlement to overtime for hours worked in excess of 40 in a workweek.

150.    An employer can pay a non-exempt employee on day rate basis provided the employee receives overtime pay for hours worked in excess of 40 in a week. 29 C.F.R. § 778.112.

151.    Defendants regularly scheduled Plaintiffs and other Day Rate Workers for 84 work hours per week. Plaintiffs and the Day Rate Workers regularly worked at least 84 hours in a week.

152.    Plaintiffs regularly worked more than 40 hours each week.

153.    Defendants typically scheduled Plaintiffs for 12 hours of work a day.

154.    While working in the oilfield, Plaintiffs typically worked at least 12 hours a day.

155.    Defendants scheduled Plaintiffs for as many as 7 days a week.

156.    Plaintiffs regularly worked 7 days in a single week.

157.    As a result, Plaintiffs regularly worked 84 (or more) hours a week.

158.    Defendants know their Day Rate Workers work more than 40 hours in a week. Defendants' records reflect this fact.

159.    Defendants also know their Day Rate Workers are not exempt from the FLSA's overtime provisions (or the provisions of any similar state overtime laws).

160.    Nonetheless, Defendants do not pay their Day Rate Workers overtime for hours worked in excess of 40 in a workweek.

161.    Defendants knew, or showed regardless disregard, for whether their policy of excluding bonuses when calculating overtime pay violated the FLSA and the New Mexico, North Dakota, Ohio, and Pennsylvania Wage Laws.

**PROCEDURAL BACKGROUND**

162.    Because Defendants failed to pay overtime as required by the FLSA and state law, Joseph Gutierrez and Lynn filed suit against DCDC in this Court on January 7, 2014. *DCDC 1*, ECF No. 1.

163.    DCDC filed its answer in *DCDC 1* on April 10, 2014. *DCDC 1*, ECF No. 10.

164.    DCDC moved to compel arbitration in *DCDC 1* over 8 months after its appearance, on January 29, 2015. *DCDC 1*, ECF No. 29.

165.    As part of its motion to compel arbitration, DCDC said "any disputes … including any objections with respect to the existence, scope, or validity of the arbitration agreement" and determinations regarding "arbitrability" were questions "for the arbitrator to decide, not [a] Court." *See DCDC 1*, ECF No. 29, at *5.

166.    By an agreed order, the parties in *DCDC 1* then submitted the dispute to arbitration. *DCDC 1*, ECF No. 34.

167.    The Court dismissed the case except for "the limited judicial review permitted by the Federal Arbitration Act[.]" *DCDC 1*, ECF No. 34.

168.    As an employer-promulgated plan, DCDC was responsible for all costs of arbitration with Plaintiffs.

169.    DCDC knew it was responsible for all costs of arbitration when it requested that the Court compel arbitration.

170.    DCDC knew it was responsible for all costs of arbitration when it entered an agreed order before the Court compelling arbitration.

171.     The Parties proceeded to arbitration before the AAA in *DCDC 2*.

172.     Plaintiffs requested on June 25, 2015, that the arbitrator issue a formal order regarding the party responsible for arbitration costs.

173.     On August 14, 2015, the Arbitrator granted Claimants' Arbitrator Compensation Request and determined that "all AAA administrative fees and all arbitrator's compensation and expenses incurred herein shall be borne by Respondent."

174.     Claimants filed a clause construction brief on June 26, 2015, requesting that the arbitrator determine whether DCDC's arbitration clause permitted class or collective arbitration.

175.     On August 14, 2015, the Arbitrator decided DCDC's arbitration agreement permitted collective arbitration.

176.     Despite its earlier representation to this Court that its arbitration policy "clear and unmistakably vests the arbitrator, and the not district court, with authority to decide which disputes are subject to arbitration,"[1] DCDC filed suit to vacate the AAA's award. *See Drill Cuttings Disposal Company, LLC v. Gutierrez* ("*DCDC 4*"), No. 6:15-cv-02532-EEF-CBW, ECF No. 1-2 (W.D. La. Oct. 14, 2015).

177.     To further delay progress of this case, DCDC filed suit against Gutierrez and Lynn in the 15th Judicial District Court of Lafayette Parish, Louisiana. *Drill Cuttings Disposal Company LLC v. Gutierrez* ("*DCDC 3*"), No. C-20154537 D (La. Dist.—Lafayette Par., Sept. 1, 2015); *DCDC 4*, ECF No. 1-2.

178.     DCDC knew that Gutierrez and Lynn were not residents of Louisiana.

179.     DCDC knew that the subject matter of the lawsuit involved the FLSA.

180.     DCDC knew that this Court had original jurisdiction. 29 U.S.C. § 216(b).

---

[1] *DCDC 1*, ECF No. 29, at *5.

181.    DCDC deliberately chose not to file suit in the Western District of Texas, where *DCDC 1* had been pending.

182.    DCDC deliberately chose not to file suit in federal court, causing Gutierrez and Lynn to have to incur cost and delay in removing the case.

183.    Gutierrez and Lynn removed the case to the Western District of Louisiana.

184.    DCDC refused to agree to a transfer of venue to this Court. *See DCDC 4*, ECF No. 24.

185.    Gutierrez and Lynn had to file a contested motion to transfer venue to this Court. *DCDC 4*, ECF No. 22.

186.    Gutierrez and Lynn successfully moved to transfer venue to this Court. *DCDC 4*, ECF No. 40.

187.    Because of DCDC's delay tactics, it took over a year just to transfer venue to the proper court.

188.    Once venue was returned to this Court, Lynn and Gutierrez moved to confirm the award. *DCDC 5*, ECF No. 42.

189.    DCDC failed to respond in time. *DCDC 5*, ECF No. 42, at *2 n.2.

190.    Eight days late, DCDC's President, Jeffrey A. Reddoch, filed a *pro se* extension of the time to respond on DCDC's behalf,[2] which was denied by the Court because DCDC, as a business entity, must be represented by counsel. *DCDC 5*, ECF No. 47, at *2.

191.    DCDC ultimately filed a response, which this Court considered (even though the Court noted the untimely response "need not [be] address[ed]") in reaching its ultimate conclusion. *See DCDC 5*, ECF No. 50, at *3.

---

[2] *DCDC 5*, ECF No. 46.

192.    This Court found that "the Clause Construction Award shows on its face that Arbitrator Brewer was interpreting the Employment Agreement." *DCDC 5*, ECF No. 50, at *3.

193.    The Court ultimately concluded

the arbitrator focused on the Employment Agreement's text and analyzed (whether correctly or not makes no difference) whether it demonstrated the parties' intent to submit to collective arbitration. This suffices to show that the arbitrator did not "exceed[ ] [his] powers."[3]

194.    The Court further explained that DCDC's arguments were wholly "without merit." *DCDC 5*, ECF No. 50 at *3.

195.    The Court dismissed two of DCDC's primary arguments as "incredulous" and, a second time, "without merit." *DCDC 5*, ECF No. 50 at *3.

196.    Despite the district court's decision, DCDC then undertook an appeal to the Fifth Circuit. *Drill Cuttings Disposal Co. v. Lynn* ("*DCDC 6*"), No. 16-51381 (5th Cir.).

197.    DCDC claimed that it wanted to mediate the case. *DCDC 6*, Doc. No. 00513860457.

198.    The Parties therefore agreed to a stay or dismissal of the case pursuant to Fifth Circuit Rules 27.1.3 and 42.4, ostensibly to engage in settlement discussions. *DCDC 6*, Doc. No. 00513860457.

199.    The Parties attended a settlement conference conducted by Magistrate Judge Patrick J. Hanna on March 9, 2017. *DCDC 4*, ECF No. 42.

200.    The settlement conference was cut short because DCDC claimed poverty. *DCDC 4*, ECF No. 2.

201.    Judge Hanna ordered that Plaintiffs submit a list of the financial information necessary for Plaintiffs to evaluate DCDC's ability to pay. *DCDC 4*, ECF No. 2.

202.    Plaintiffs submitted correspondence to Judge Hanna and DCDC on March 20, 2017.

---

[3] *DCDC 5*, ECF No. 50. at *4 (quoting 9 U.S.C. § 10(a)(4)).

203.    As part of the minute entry, Judge Hanna ordered that DCDC's financial documentation should be provided by March 21, 2017. *DCDC 4*, ECF No. 2.

204.    Despite its claims of poverty, DCDC would not turn over any financial information to verify its financial condition.

205.    Despite its claims of poverty, DCDC would not provide any financial information about RDC and the Reddochs.

206.    DCDC never turned over any financial information at all.

207.    DCDC ignored Plaintiffs' repeated requests for this information.

208.    DCDC ignored Judge Hanna's written orders.

209.    DCDC ignored Judge Hanna's oral orders.

210.    DCDC just ignored Judge Hanna completely.

211.    Because of DCDC's refusal to document its claimed poverty, settlement discussions did not advance.

212.    DCDC moved to reopen the appeal on August 7, 2017.

213.    By the time the appeal was resumed, DCDC had not provided the documentation Plaintiffs requested in January 2017.

214.    By the time the appeal was resumed, DCDC had not provided the documentation requested by Judge Hanna since March 2017.

215.    DCDC never had any intention of settling this case.

216.    DCDC never had any intention of mediating the case in good faith.

217.    Having decided at the March mediation that it was not planning to comply with Claimants' request for financial documentation and Judge Hanna's order for the same, DCDC had nonetheless waited 185 days, until five days past deadline to reopen the appeal.

218.    Prior to August 7, 2017, DCDC had made no attempt to reopen the appeal, nor had it conferred with Plaintiffs regarding the reinstatement of the case. As such, the Court noted on August 10 that a motion to reopen the case would be necessary.

219.    DCDC then moved for the first time to reinstate the case on August 14 (now 12 days late), which was ultimately granted by the clerk.

220.    DCDC then submitted an insufficient brief to the clerk, who advised DCDC that its brief failed to comply with Fifth Circuit and Federal Rule of Appellate Procedure formatting rules and that DCDC had still not provided the court with a record on appeal.

221.    The clerk nonetheless provided DCDC (on October 11) with 14 days to fix the errors.

222.    By November 7—a whole 27 days later!—DCDC had still not fixed the errors in its brief or provided the record on appeal. The clerk therefore ordered the appeal dismissed.

223.    Even though DCDC poured significant attorney fees into its two-year-long appeal, it continuously refused to pay the AAA's bills.

224.    A suspension order due to nonpayment was issued by the arbitrator on May 18, 2016.

225.    While on appeal, DCDC (paid its attorneys to) complain about the AAA and the arbitrator's billing.

226.    DCDC claimed during the appeal that the arbitrator was biased because "he charges $550/hour to handle, the bigger the better."

227.    On November 8, 2017, after the appeal was dismissed and before the AAA's termination order was issued, Plaintiffs sent interrogatories, requests for production, and requests for admission to DCDC.

228.    The discovery was sent by email and certified mail, return receipt requested.

229.    DCDC's discovery responses were due on or before December 7, 2017.

230.    DCDC's discovery responses were due no later than December 11, 2017.

231.    DCDC never requested an extension for the discovery responses.

232.    DCDC never responded to the interrogatories, requests for production, or requests for admission.

233.    DCDC's objections, if any, to the interrogatories, requests for production, or requests for admission, are all waived.

234.    By its failure to respond, DCDC has admitted each allegation in Plaintiffs' requests for admission.

235.    After the appeal was dismissed, Plaintiffs filed a motion for conditional certification and a motion for equitable tolling before the AAA.

236.    Plaintiffs' motions for conditional certification and tolling were filed on November 8, 2017.

237.    DCDC never responded to either the motion for conditional certification or the motion for equitable tolling.

238.    The AAA issued a final termination order on January 29.

239.    At the time the termination was ordered, Plaintiffs' motions for conditional certification and equitable tolling were still pending.

240.    In all, since DCDC's appeal of the arbitrator's clause construction award began, nothing has happened in the underlying dispute since August 2015.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

241.    Plaintiffs bring their claims under the FLSA as a collective action.

242.    The members of the FLSA Class are similarly situated to Plaintiffs in all relevant respects.

243.    Stephens brings his claims under the New Mexico Wage Laws as a Rule 23 class action.

244.    Gutierrez and Stephens bring their claims under the North Dakota Wage Laws as a Rule 23 class action.

245.    Stephens brings his claims under the Ohio Wage Laws as a Rule 23 class action.

246.    Stephens brings his claims under the Pennsylvania Wage Laws as a Rule 23 class action.

247.    The members of the New Mexico Class are similarly situated to Stephens in all relevant respects.

248.    The members of the North Dakota Class are similarly situated to Gutierrez and Stephens in all relevant respects.

249.    The members of the Ohio Class are similarly situated to Stephens in all relevant respects.

250.    The members of the Pennsylvania Class are similarly situated to Stephens in all relevant respects.

251.    The same policy that caused Plaintiffs to be shorted on their overtime pay caused Defendants' other workers to be shorted on their overtime pay as well.

252.    While the precise job duties performed by the FLSA Class and each state class (New Mexico, North Dakota, Ohio, and Pennsylvania) might vary somewhat, these differences do not matter for the purposes of determining their entitlement to overtime.

253.    Nor do any differences in job duties matter for determining whether Defendants' policy of failing to pay overtime is legal (it isn't).

254.    The members of the FLSA Class are all entitled to overtime after 40 hours in a week, and the overtime they are entitled to must be calculated in a manner consistent with the regular rate requirements of the FLSA. 29 U.S.C. § 216(b).

255.    The members of the New Mexico Class are all entitled to overtime after 40 hours in a week, and the overtime they are entitled to must be calculated in a manner consistent with the regular rate requirements of the New Mexico Wage Laws.

256.    The members of the North Dakota Class are all entitled to overtime after 40 hours in a week, and the overtime they are entitled to must be calculated in a manner consistent with the regular rate requirements of the North Dakota Wage Laws.

257.    The members of the Ohio Class are all entitled to overtime after 40 hours in a week, and the overtime they are entitled to must be calculated in a manner consistent with the regular rate requirements of the Ohio Wage Laws.

258.    The members of the Pennsylvania Class are all entitled to overtime after 40 hours in a week, and the overtime they are entitled to must be calculated in a manner consistent with the regular rate requirements of the Pennsylvania Wage Laws.

259.    Defendants employed many hourly and salaried employees like Plaintiffs in the United States during the three years preceding January 7, 2014.

260.    The members of the FLSA Class are geographically disbursed, residing and working in multiple states.

261.    Because the members of the FLSA Class do not have fixed work locations, these individuals may work in different states across the country in the course of a given year.

262.    Most of the questions related to the FLSA Class can be answered on a collective basis.

263.    Defendants employed many day rate employees like Stephens in New Mexico during the three years preceding April 5, 2015.

264.    The members of the New Mexico Class are geographically disbursed, residing and working in multiple states.

265.    Because the members of the New Mexico Class do not have fixed work locations, these individuals may work in different states across the country in the course of a given year.

266.    Most of the questions related to the New Mexico Class can be answered on a class basis.

267.    Defendants employed many day rate employees like Gutierrez and Stephens in North Dakota during the three years preceding January 7, 2014.

268.    The members of the North Dakota Class are geographically disbursed, residing and working in multiple states.

269.    Because the members of the North Dakota Class do not have fixed work locations, these individuals may work in different states across the country in the course of a given year.

270.    Most of the questions related to the North Dakota Class can be answered on a class basis.

271.    Defendants employed many day rate employees like Stephens in Ohio during the three years preceding April 5, 2015.

272.    The members of the Ohio Class are geographically disbursed, residing and working in multiple states.

273.    Because the members of the Ohio Class do not have fixed work locations, these individuals may work in different states across the country in the course of a given year.

274.    Most of the questions related to the Ohio Class can be answered on a class basis.

275.    Defendants employed many day rate employees like Stephens in Pennsylvania during the three years preceding April 5, 2015.

276.    The members of the Pennsylvania Class are geographically disbursed, residing and working in multiple states.

277.    Because the members of the Pennsylvania Class do not have fixed work locations, these individuals may work in different states across the country in the course of a given year.

278.    Most of the questions related to the Pennsylvania Class can be answered on a class basis.

279.    Defendants exercised their pay practices at issue in this case on the basis of established policies.

280.    Defendants' policies either comply with the FLSA, or they do not, and this decision can be made on a class-wide basis.

281.    Defendants' policies either comply with the New Mexico Wage Laws, or they do not, and this decision can be made on a class-wide basis.

282.    Defendants' policies either comply with the North Dakota Wage Laws, or they do not, and this decision can be made on a class-wide basis.

283.    Defendants' policies either comply with the Ohio Wage Laws, or they do not, and this decision can be made on a class-wide basis.

284.    Defendants' policies either comply with the Pennsylvania Wage Laws, or they do not, and this decision can be made on a class-wide basis.

285.    Defendants' payroll and time-keeping records would permit accurate calculation of damages with respect to each member of the FLSA and state classes.

286.    Absent a collective action, many members of the FLSA Class likely will not obtain redress of their injuries and Defendants will retain the proceeds of their violations of the FLSA.

287.    Absent a class action, many members of each of the state classes likely will not obtain redress of their injuries and Defendants will retain the proceeds of their violations of state law.

288.    Individual litigation would be unduly burdensome to the judicial system.

289.    Concentrating the litigation in one forum will promote judicial economy and parity among the claims of individual members of the classes and provide for judicial consistency.

290.    The questions of law and fact common to each of the Putative Class Members predominate over any questions affecting solely the individual members. Among the common questions of law and fact are:

a.    Whether the Putative Class Members were exempt from overtime;

b.    Whether the Putative Class Members were not paid overtime at 1.5 times their regular rate of pay for hours worked in excess of 40 in a workweek;

c.    Whether Defendants' decision to not pay overtime to the Putative Class Members was made in good faith; and

d.    Whether Defendants' violation of the FLSA and state law was willful.

291.    Each class representative's claims are typical of the claims of the Putative Class Members they intend to represent.

292.    Each class representative and their Putative Class Members have sustained damages arising out of Defendants' illegal and uniform employment policy.

293.    Each class representative knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

294.    Although the issue of damages may be somewhat individual in character, there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude class or collective action treatment.

### FIRST CAUSE OF ACTION—VIOLATION OF THE FLSA

295.    Plaintiffs incorporate the preceding paragraphs by reference.

296.    At all relevant times, Defendants have been an employer engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA.

297.    Defendants employed Plaintiffs and each member of the FLSA Class.

298.    Defendants' pay policy denied Plaintiffs and the FLSA Class overtime compensation as required by the FLSA.

299.    Defendants' failure to pay Plaintiffs and the FLSA Class proper overtime violates 29 U.S.C. § 207.

300.    Defendants' conduct, as described herein, was in willful violation of the FLSA.

301.    Due to Defendants' FLSA violations, Plaintiffs and the FLSA Class are entitled to recover from Defendants their unpaid overtime compensation, liquidated damages, reasonable attorney fees, costs, and expenses of this action.

SECOND CAUSE OF ACTION—VIOLATIONS OF NEW MEXICO WAGE LAWS

302.    The conduct alleged in this Complaint violates the New Mexico Wage Laws.

303.    Defendants were and are an "employer" within the meaning of the New Mexico Wage Laws.

304.    At all relevant times, Defendants employed Stephens, and each of the New Mexico Class members, as an "employee" within the meaning of the New Mexico Wage Laws.

305.    The New Mexico Wage Laws require an employer like Defendants to pay overtime to all non-exempt employees.

306.    Stephens and the other New Mexico Class members are non-exempt employees who are entitled to be paid overtime for all overtime hours worked.

307.    Within the applicable limitations period, Defendants had a policy and practice of failing to pay proper overtime to the New Mexico Class members for their hours worked in excess of 40 hours per week.

308.    As a result of Defendants' failure to pay proper overtime to Stephens and the New Mexico Class members for work performed in excess of 40 hours in a workweek, Defendants violated the New Mexico Wage Laws.

309.    Stephens and the New Mexico Class are entitled to overtime wages under the New Mexico Wage Laws in an amount equal to 1.5 times their rates of pay, plus liquidated damages, attorney's fees, and costs. NMSA § 50-4-26.

310.    The improper pay practices at issue were part of a continuing course of conduct, entitling Stephens and the New Mexico Class to recover for all such violations, regardless of the date they occurred. NMSA § 50-4-32.

### THIRD CAUSE OF ACTION— VIOLATIONS OF NORTH DAKOTA WAGE LAWS

311.    The conduct alleged in this Complaint violates the North Dakota Wage Laws.

312.    Defendants were and are an "employer" within the meaning of the North Dakota Wage Laws.

313.    At all relevant times, Defendants employed Gutierrez, Stephens, and the North Dakota Class as an "employee" within the meaning of the North Dakota Wage Laws.

314.    The North Dakota Wage Laws requires employers to pay overtime to all non-exempt employees.

315.    Gutierrez, Stephens, and the North Dakota Class members were and are non-exempt employees who are entitled to be paid overtime for all overtime hours worked.

316.    Within the applicable limitations period, Defendants had a policy and practice of failing to pay overtime pay to Gutierrez, Stephens, and the North Dakota Class members for their hours worked in excess of 40 hours per week.

317.    Within the applicable limitations period, Defendants had a policy and practice of requiring Gutierrez, Stephens, and the North Dakota Class members to work seven or more consecutive days in a row.

318.    As a result of Defendants' failure to pay overtime to Gutierrez, Stephens, and the North Dakota Class, Defendants violated the North Dakota Wage Laws.

319.    As a result of Defendants' requirement that Gutierrez, Stephens, and the North Dakota Class Members work seven or more consecutive days in a row, Defendants violated the North Dakota Wage Laws.

320.    Gutierrez, Stephens, and the North Dakota Class are entitled to recover their unpaid overtime based on Defendants' failure to pay 1.5 times their regular rates of pay for work performed in excess of 40 hours in a week, an amount equal to these underpayments as liquidated damages, and such other legal and equitable relief resulting from their violations of the North Dakota Wage Laws as the Court deems just and proper.

321.    Gutierrez, Stephens, and the North Dakota Class also seek recovery of attorneys' fees and costs of this action to be paid by Defendants, as provided by the North Dakota Wage Laws.

**FOURTH CAUSE OF ACTION— VIOLATIONS OF OHIO WAGE LAWS**

322.    The conduct alleged violates the Ohio Wage Laws.

323.    At all relevant times, Defendants were and are subject to the requirements of the Ohio Wage Laws.

324.    At all relevant times, Defendants employed Stephens and each Ohio Class member as an "employee" within the meaning of the Ohio Wage Laws.

325.    The Ohio Wage Laws require employers like Defendants to pay employees at 1.5 times the regular rate of pay for hours worked in excess of 40 hours in any one week. Stephens and each member of the Ohio Class are entitled to overtime pay under the Ohio Wage Laws.

326.    Defendants have a policy and practice of failing to pay overtime to Stephens and the other Ohio Class Members for hours worked in excess of 40 hours per workweek.

327.    Stephens and the Ohio Class seek unpaid overtime in an amount equal to 1.5 times the regular rate of pay for work performed in excess of 40 hours in a workweek, prejudgment interest, all available penalty wages, and such other legal and equitable relief as the Court deems just and proper.

328.     Stephens and the Ohio Class also seek recovery of attorneys' fees, costs, and expenses of this action, to be paid by Defendants, as provided by the Ohio Wage Laws.

### FIFTH CAUSE OF ACTION—VIOLATIONS OF PENNSYLVANIA WAGE LAWS

329.     The conduct alleged violates the Pennsylvania Wage Laws (43 PA. STAT. ANN. § 333.104).

330.     At all relevant times, Defendants were subject to the requirements of the Pennsylvania Wage Laws.

331.     At all relevant times, Defendants employed Stephens and each Pennsylvania Class Member as an "employee" within the meaning of the Pennsylvania Wage Laws.

332.     The Pennsylvania Wage Laws requires employers like Defendants to pay employees at 1.5 times the regular rate of pay for hours worked in excess of 40 hours in any one week. Stephens and each Pennsylvania Class Member are entitled to overtime pay under the Pennsylvania Wage Laws.

333.     Stephens and the Pennsylvania Class seek unpaid overtime in amount equal to 1.5 times the regular rate of pay for work performed in excess of 40 hours in a workweek, prejudgment interest, all available penalty wages, and such other legal and equitable relief as the Court deems just and proper.

334.     Stephens and the Pennsylvania Class also seek recovery of attorneys' fees, costs, and expenses of this action, to be paid by Defendants, as provided by the Pennsylvania Wage Laws.

### JURY DEMAND

335.     Plaintiffs demand a trial by jury.

### PRAYER

336.     Wherefore, Plaintiffs pray for:

    a.     An order finding DCDC, RDC, and the Reddochs to be joint employers pursuant to the FLSA and state laws;

b.      An order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) to the FLSA Class to permit them to join this action by filing a written notice of consent;

c.      An order certifying Stephens' claims under the New Mexico Wage Laws as a class action under Rule 23, appointing Stephens as class representative, and his counsel as Class Counsel;

d.      An order certifying Gutierrez and Stephens' claims under the North Dakota Wage Laws as a class action under Rule 23, appointing Gutierrez and Stephens as class representatives, and their counsel as Class Counsel;

e.      An order certifying Stephens' claims under the Ohio Wage Laws as a class action under Rule 23, appointing Stephens as class representative, and his counsel as Class Counsel;

f.      An order certifying Stephens' claims under the Pennsylvania Wage Laws as a class action under Rule 23, appointing Stephens as class representative, and his counsel as Class Counsel;

g.      A judgment against the Employers awarding Plaintiffs, the FLSA Class, the New Mexico Class, the North Dakota Class, the Ohio Class, and the Pennsylvania Class all their unpaid overtime compensation and an additional, equal amount, as liquidated damages under the FLSA, as well as any compensation, damages, penalties, and/or interest under applicable state law;

h.      An order awarding attorney fees, costs, and expenses;

i.      Pre- and post-judgment interest at the highest applicable rates; and

j.      Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

*/s/ Matthew S. Parmet*

By: _____

Richard J. (Rex) Burch
Texas Bar No. 24001807
Matthew S. Parmet
Texas Bar No. 24069719
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:      (713) 877-8788
Telecopier:      (713) 877-8065
rburch@brucknerburch.com
mparmet@brucknerburch.com

**Attorneys for Plaintiffs**